# WHEELING.

CUNNINGHAM *v.* HEDRICK *et al.*

Submitted September 10, 1883—Decided March 22, 1884.

1. Before sections 35 and 36 of chapter 125 of the Code were passed, while it was proper and in accordance with the strict rules of pleading when a bill to enforce a vendor's lien on real estate was filed, if the defendant wished to rescind the contract because the defendant was of unsound mind when it was made, or it was procured by fraud, to file a cross-bill for that purpose ; yet where the record showed that the relief could as well be given upon the bill and answer and proofs taken, as if a cross-bill were filed, the filing was dispensed with, as in such case it would be a mere formality to require it. (p. 590.)

2. Now under the operation of said sections 35 and 36, where the answer contains material allegations constituting a claim for

affirmative relief, and no "reply in writing" is filed but a general replication, and the cause has been heard upon the pleadings thus made up and the proofs taken, if the record shows that it is not such a case, as would before the passage of said sections have made the filing of a cross-bill necessary in order to entitle the defendant to the relief sought, the decree will not be reversed because no "reply in writing" was filed. (p. 591.)

3. Where in such a case the defendant has taken depositions, and it appears that there was a full and fair hearing of the cause upon its merits, and that substantial justice has been done, though there was an informality in not requiring the plaintiff to file a "reply in writing," the decree will not be reversed for this reason. (p. 592.)

4. In a suit to enforce a vendor's lien it is not error to decree a sale of the land on which the lien for the purchase-money is reserved or so much thereof as is necessary without ascertaining the amount of other liens thereon and their priorities. (p. 593.)

The facts of the case are stated in the opinion of the Court.

*George A. Blakemore* for appellant.

*W. H. H. Flick* and *W. T. Dyer* for appellee.

JOHNSON, PRESIDENT:

The plaintiff filed his bill in the circuit court of Pendleton county in June, 1871, against Eve Hedrick, Isaac T. Kile and Geo. W. Kile, alleging that Eve Hedrick had purchased a tract of three hundred and sixty-nine acres of land of George W. Kile for the sum of one thousand five hundred dollars, of which she paid part and executed her single bill for the residue; that Kile executed and delivered a deed for the land to said Eve Hedrick, which deed was duly acknowledged for recordation and in which a lien was reserved for the purchase-money; that Eve Hedrick has failed to record said deed; that said Geo. W. Kile for a valuable consideration assigned said single bill to Isaac T. Kile, and for a valuable consideration said Isaac T. Kile assigned it to the plaintiff; that said Eve Hedrick failed to pay said note and that plaintiff instituted a suit at law thereon against her and recovered a judgment by default for nine hundred and ninety dollars and seventy-three cents principal and interest, with interest on said judgment from the 18th day of November, 1870, and

the costs; that execution issued on said judgment and was returned "no property found." He claims the benefit of his lien reserved in the deed as well as his judgment-lien, and claims that his judgment is a lien on all the lands owned by said Eve Hedrick, and charges that she has title to an eight hundred and eighty acre tract, a fifty-two acre tract, also an undivided half interest in a twenty-eight acre tract, all of which he describes in his bill. He prays that the three hundred and sixty-nine acres be first subjected, and then enough of the others to pay his liens, if that should prove insufficient, and for general relief.

On the 16th day of November, 1871, he filed an amended bill, in which he alleges, that two judgments older than his were recovered against said Eve Hedrick, one for twenty dollars and thirty cents with interest from June 6, 1868, in favor of Jas. W. Dahmer, and the other for one hundred dollars, with interest from February 11, 1867, in favor of John G. Dahmer, and makes said two judgmant-leinors defendants to the suit. Process was ordered to be issued upon the filing of said amended bill.

On the 10th day of April, 1872, the court entered an order as follows: "It appears to the court that, since the institution of the suit it was suggested to the recorder of Pendleton county, that the defendant, Eve Hedrick, was *non compos mentis*, and that said recorder regularly appointed Andy Dyer her committee; said Eve Hedrick through said committee has leave to and does file her answer in this cause." In said answer it is averred that Eve Hedrick "since her birth has labored under a lamentable weakness of intellect, which has always rendered her totally incompetent to manage with even the slightest degree of prudence her domestic and business affairs. She has indeed been an idiot for twenty years, and classed among them by all acquainted with her, save such as desired her to be represented as of legal mind that they might plunder and rob her of her little property." It is further averred that she cannot read or write a word of English, and cannot read with any intelligence even in her vernacular, the German; that she has never been able to count money of any description, and that any one might defraud her; that she has never been out of her

county, and has lived for years under the influence, misrule and mismanagement of one Henry Ayres, who, although a person of some little sense, is easily imposed upon by designing men, and who has always been the medium through whom sharpers and tricksters have imposed upon and defrauded her; that she was such a person when Geo. W. Kile came to her in 1866 and proposed to and did sell to her the three hundred and sixty-nine acres of land in the bill mentioned; that said Kile well knew her great mental weakness and intended to and did take advantage of her in the sale of said land; that he committed a great fraud upon her in selling to her the said land at the price of one thousand five hundred dollars; that he came to her repeatedly about the sale of said land; said that he would sell it to some one else, who would be in her way; that he said the same to Henry Ayres, knowing that said Ayres would persuade her to make the purchase, as he did; that she did not know then, nor does she know now the value of money, or land; that she could not then have told, nor can she now tell what would be the average price per acre of said land, the whole selling for one thousand five hundred dollars; that she is informed and believes and so charges, that said tract of land, at the time Kile sold it to her, was not worth more than three hundred dollars, or four hundred dollars; that she is informed and believes that better land has been purchased in the same section at one dollar per acre; that at the time of said purchase she owned eight hundred and eighty acres of mountain land and had no use for the three hundred and sixty-nine; that she paid said Kile six hundred and forty-two dollars and eighty-four cents in cash on said land. She "prays that the said entire pretended contract and sale be set aside and declared void; that said deed of Kile to respondent be cancelled and delivered up; that said judgment be perpetually enjoined, and that the said Geo. W. Kile be decreed to pay back to respondent the said sum of six hundred and forty-two dollars and eighty-four cents with legal interest thereon from the 3d day of September, 1866, till paid, and that plaintiff pay the costs of this suit."

To this answer, no "reply in writing" was filed, but the plaintiff replied to it generally.

Numerous depositions were taken on the question of Eve Hedrick's capacity to make the contract, and as to the value of the land.

The defendants' depositions were in substance as follows, by the witnesses as named:

*Jacob Claylon* acted as overseer of the poor two years and a half; sold out Enos Hedrick a pauper to her, and when he went to pay her the money said she could not count money and knew nothing about it; Mr. Conrod counted the money for her; took her receipt, to which Conrod wrote her name, and witnessed it. Sold leather to her in 1865, 1866 and 1867; did not consider her capable to do any business or make any contracts. She did not know any thing about the price of leather; never thought she had sense enough to do her own trading. Bought peaches from her; she asked fifty cents a bushel for green peaches; knew it was much more than they were worth, but paid it. She did not know what they were worth. During the years 1865-6-7-8 Henry Ayres transacted her business part of the time; and sometimes she attended to it herself. Ayers was a man who was easily persuaded. Ayers had more influence with Eve Hedrick in 1865-6, than any one else. He has lived with her about twenty years. She was not an idiot; think she would be a lunatic. She acted like a woman that was not right sharp. Transacted business with her because he was elected overseer of the poor, and sold the pauper to her; was compelled to transact business with her.

*Andrew W. Dyer*, had known her for about forty years; lived about five miles from her; sold goods to her; she always acted like a woman that had but little mind. She she did not know the value of money or goods. In 1865-6 had but little ability to transact business. In 1865 or 1866, went to her house with D. C. Anderson who had a settlement to make with her. Went at his request. In settling with Anderson she seemed to know but very little about her business. Witness said, to make the matter short, I don't think she ever did have mind enough to transact any business. Thinks she is between sixty-five and seventy years of age. Eve Hedrick's mother was almost an idiot; the family had very little intelligence. She was not an idiot or a lunatic.

She always did her own trading, and never had a committee before this suit was brought, but she ought to have had.

*Loban B. Conrod* had been acquainted with her for forty or fifty years. At one time lived about a quarter of a mile from her; lived there for about thirty years. Has had no business with her of importance; nothing more than trading her a little grain for some peaches, or other fruit. She had cattle, horses, &c.; did not trade with her for cattle because she did not have the right quality, and because he did not think her capable of trading for herself. She had to have some advice and he considered it a "second handed trade" when she had to take advice from some one else. Thought it was in 1840 that he considered her very near insane; she would walk over the fields all day; never thought her mind was good since.

*Solomon Cunningham* was acquainted with the tract of three hundred and sixty-nine acres of land; considered it worth about two dollars per acre. Eve Hedrick had no use for the land. He tried to trade for it, and then was going to trade it to her provided she wanted it. Bought land in 1870 adjoining it for twenty-five cents per acre. Suppose it is worth one seventh or one eighth as much per acre as the three hundred and sixty-nine acres.

*Dr. J. D. Johnson* is a physician. Knows Eve Hedrick; not very well acquainted with her; has known her for about fifteen years; never had any business transaction with her; regarded her as rather deficient in mental capacity. Did not recollect that he had met her during the war; met her once since the war; did not think there had been any change in her mental condition; would infer that she was not very well qualified to transact business; when he saw her in 1870 her behavior was good and her personal appearance rather genteel.

*Henry Ayres* was present when the sale was made; Eve proposed to buy the land of Kile; she agreed to give him one thousand five hundred dollars. She paid him six hundred and forty-two dollars of money she had received from Ohio and gave her note for eight hundred and fifty-seven dollars. Witness is over sixty years old, and has lived with Eve Hedrick for twenty-five or twenty-six years, and is her brother-in-law. Kile asked one thousand five hundred dol-

lars for the land; he said George Bible was willing to give
that much for it, provided he had not bought another piece
of land. He said it adjoined Eve, and if she did not buy it
he would sell it to somebody else, and perhaps she might get
a bad neighbor. Witness then rather persuaded the old
woman to buy the land; suppose the land was worth five or
six hundred dollars.

*Adam Hedrick* was present when the note was executed;
was sent there by Mrs. Cunningham to persuade Eve out of
buying the land, stating that she could get it cheaper; knew
that she could not pay for the land. The bond was executed
at G. W. Kile's home; Kile said the land would suit her bet-
ter than anybody else. Was called on to sign the notes; he
met me at the door saying that I should not say anything,
that the trade was made, and he would not wish witness to
raise a disturbance; witness told him he did not wish to
raise any disturbance with either party, that he knew the
the price of the land was too high, and that he cheated her in
it, and witness would not go on the bond, that he did not
come there for that business. He said there was no danger,
he just wanted witness to sign as witness on the bond; wit-
nessed the bond. Don't think the land is worth over three
hundred dollars.

*George Bible* has been personally acquainted with Eve
Hedrick ever since he was a boy; he knew the land twenty-
five or thirty years. Kile owned a good piece of land;
asked him what he would take for the land he sold to Eve
Hedrick, think he said one thousand five hundred dollars
was the price for it; made him no offer for the land; did not
recollect of ever offering him one thousand five hundred dol-
lars for it; thinks the land was worth eight hundred dollars.
Did not think Eve Hedrick was quite as competent to do
business as women generally in her neighborhood. She
partly attended to her own affairs.

*Geo. A. Blakemore* was acquainted with Eve Hedrick in
1866. Was employed in June 1866 by Henry Ayres to
defend Eve Hedrick in an action before a justice. She and
Ayres were together and he seemed to be acting for her.
His impression was from her actions and conversation that
she had no mind and was ignorant of what was going on,

more so than people of the most ordinary minds. She said but little, and when witness talked to her, she did not appear to be able to explain anything about her case. She seemed to be willing to accede to any proposition, and to do anything Ayres would say; did not think her capable of doing any business; asked her if she had paid anything on the bond she was sued on, and she said she had; asked her how much, and she said she did not know; Ayres then said she had let her creditors have a cow or so; asked her what the cow was worth, said she did not know, Ayres would tell me.

*E. W. Boggs,* has known her for about twenty-five years; never considered her competent to transact common business; before 1861 was in the mercantile business; had a great many transactions with her which showed her weakness; does not recollect any particular instance, because it was his general opinion of her at that time; since 1865 recollect one instance; went there to look at some cattle; asked her to price them. She knew nothing about their worth; left her without making a bid. Sold her all sorts of goods prior to 1861; she paid for the goods by giving orders on the sheriff.

*James Ruddle,* has known her for over forty years; would not think she was competent to transact any business since the war; did not know whether she managed her own affairs or not.

For the plaintiff:

*Isaac T. Kile,* held the offices of county-surveyor and justice. Surveyed the land, partly, and from what he saw and calculations he made the tract contained three hundred and seventy-five acres.

*James W. Webb,* thought the land was worth fifteen dollars per acre.

*J. S. Bond,* examined the land; thought the whole tract was low at five dollars per acre; has known Eve Hedrick for twenty years; has no recollection of speaking to her since the war; at the time he was acquainted with her was of opinion she was capable of transacting business; was constable; settled business with her and saw nothing wrong in her mind; bought a colt of her.

*William A. Smith,* was acquainted with the land; thought it was worth five dollars per acre.

*Susannah Hartman*, had known Eve Hedrick for a long time; she rented witness a house on the land she bought from G. W. Kile, and she had been living there for two years; never saw anything wrong with her mind; thought she was capable of transacting business, when she rented the house to witness; she had been before that attending to her own affairs, trading and selling; she traded like other women; she was as competent as other women in the neighborhood; first heard her ability to do business questioned about two years ago.

*Henry Roberson*, was acquainted with Eve Hedrick in 1866, had known her for twenty years or longer. She owned land, and during the whole time spoken of she managed the land herself, made the contracts of renting herself as far as witness knew; knew of nobody else making contracts for her. Up to three years ago witness considered her capable to transact business, considered her capable now; thought her capacity to do business would compare well with that of other women in the county; her knowledge of the values of property and money appeared to be pretty good as far as witness knew; had dealings with her; first he bought a few head of sheep, paid her for them; rented a place from her on the river; she had the contract put in writing and placed in the hands of Mr. Conrod; in one contract witness was to plant willow trees along the river bank to keep the river from washing the place; was also to trim the fruit trees, repair the fencing and take good care of the house; made the contract for the sheep about four years ago; thinks she got the best of the bargain. Witness paid a fair rent, and the people in the neighborhood thought so too. On one contract of renting witness was required to pay one hundred dollars in advance, was to do fifty dollars worth of work at once, which he did. One contract was that he was to pay one hundred dollars within five years after he got possession.

*Christian S. Bowers* had been acquainted with Eve Hedrick twenty-five or twenty-six years; had done blacksmith-work for her; was overseer of the poor before the war, and contracted with her to keep a pauper; contracted with her to keep the pauper one of the four years for seventy-five dollars; thought that was the lowest; thought no two years were the same.

*Reuben Dahmer* had known Eve Hedrick for twenty years at least; did some hauling for for her; sold her some hogs, and bought some of her; thought he had sold her hay; hauled hay for her and bought hay for her. Knew of her renting land to Eli Harman and Henry Robinson. She has always been attending to her own business; never knew her to get any one to attend to business for her up to 1867; always thought "she traded as hard as anybody" witness had dealings with; thought she would compare very well with the average of women; thought the land she bought, of Kile was worth six or seven dollars an acre; did not know whether Eve Hedrick could read and write and count money or not. Never was on as much as fifty acres of the land.

*Christian S. Bowers* recalled—Eve Hedrick seemed to know the rise and fall in the price of grain, &c., in the different years witness had business with her; thought she ought to know what money was worth, from the fact, that she knew when prices were going up or coming down.

*Ahio Hartman* had been acqainted with Eve Hedrick some thirty years; lived within about a mile from her for five years; her ability to make contracts was pretty good; she attended to her own affairs while I lived near her; never knew any one to give her any counsel in her transactions; she attended to them herself; was acquainted with the land she bought of Kyle; thought it worth five dollars per acre; lived on the land five years. On cross-examination said, he thought it ought to be worth seven dollars per acre after it was cleared; would be worth about five dollars per acre to clear it. There is a part of the land partly timbered, and is worth a great deal more than the cleared land; thought the tract worth one thousand five hundred dollars; would have been willing to pay that if he had the money.

*Isaac I. Kile* was at Eve Hedrick's; she told Geo. W. Kile that she wanted the land, but as the girls were opposed to her buying the land she would not close that day; she asked witness what he thought about her buying the land; told her to do as she chose; that if she could not pay for the land, she had better not take it, but if she could pay for it, and the land suited her to take it. She said if Geo. W. Kile would give her time as they agreed, she would take the land. The

bargain was that she was to take the land at one thousand five hundred dollars. She paid down something over six hundred dollars, and gave her note payable in four years for the residue. At the time Eve said that she was keeping a pauper at about two hundred dollars a year, and that if she could get four years to pay the residue, she could pay it out of that money.

*Jonathan Hiser,* in 1859 had business transactions with Eve Hedrick. Was constable and had claims to collect from Eve Hedrick. She paid witness all the claims he had against her; witness always made his own calculations, did not know whether Eve could make any calculation for herself or not. Had passed over a portion of the land several times, it was fine mountain land; the portion he saw ought to be worth five or six dollars an acre.

*Geo. W. Kile,* told Eve Hedrick she might have the land and he would wait for the balance four years without interest if she thought she could pay for it in that time. She said she thought she could, and told witness how she thought she could pay for it. She said she was getting a big price for keeping Enos Hedrick, a pauper, and said she had right smart of stock on hand that she could spare, that she could make the money out of it in that time with what she got for keeping Enos Hedrick. Eve Hedrick first spoke to witness about buying the land. The negotiations about the land continued for three or four months. Witness considered the land low at one thousand five hundred dollars. Witness thought Eve Hedrick competent to make the contract, he made no misrepresentation to her nor to Henry Ayres.

On the 1st day of, May, 1880, the decree shows, " the cause came on to be heard upon the bill and amended bill, the answer of Eve Hedrick by her committee, Andy Dyer, *and replication thereto,* and other papers formerly read, &c.," and the court adjudged, &c., that the contract for the purchase of the said three hundred and sixty-nine acres of land, made between George W. Kile and Eve Hedrick be sustained, and being further of opinion that the debt in the complainant's bill mentioned is a valid lien upon the lands of Eve Hedrick it is adjudged, ordered and decreed that Garrett Cunningham recover of the defendant, Eve Hedrick, the sum of one

thousand four hundred and fifty-six dollars and eighty-nine cents the aggregate amount of principal and interest of said debt with interest from the 1st day of May, 1880, until paid, together with his costs at law in this behalf expended, including an attorney's fee of fifteen dollars, and unless the said sum was paid within sixty days the commissioner therein appointed was required to sell the said three hundred and sixty-nine acre tract of land or so much as might be necessary to pay said claim, after deducting, &c. The decree concluded, "and Commissioner Frank Anderson is directed to ascertain and report to the court at its next term, whether the judgments mentioned in the amended bill in favor of J. W. Dahmer and John G. Dahmer are subsisting liens, and whether there are any other liens on the lands of Eve Hedrick and the amounts thereof and their priorities; also ascertain the annual and permanent value of the lands of said Eve Hedrick, other than the tract hereby decreed to be sold.

From this decree Eve Hedrick appealed.

It is assigned as error that the court read the testimony in the cause, because the answer of Eve Hedrick's committee sets up a claim for affirmative relief, and to this answer no reply in writing was filed. · It appears to my entire satisfaction from a critical analysis of the evidence, that the defendant has failed to show either the mental incapacity of Eve Hedrick to make the said contract, or any fraud in its procurement. According to the well settled principles governing the weight of evidence in such cases the great preponderance of the testimony is in favor of her capacity to make the contract and of its fairness. *Nicholas v. Kershner*, 20 W. Va. 251, and *Jarrett v. Jarrett*, 11 W. Va. 584. But it is strenuously contended, that, because there was no reply in writing filed to the answer, its averments must be taken as true, and that therefore the testimony taken goes for naught. Section 35 of chapter 125 of the Code, which is relied on, provides as follows: · "The defendant in a suit in equity may in his answer allege any new matter constituting a claim for affirmative relief in such suit in the same manner and with like effect, as if the same had been alleged in a cross-bill filed therein; and in such case, if the plaintiff desires to controvert the relief prayed for in the answer, he shall file a reply in

writing denying such allegations of the said answer as he does not admit to be true, and stating any facts constituting a defence thereto." Section 36 provides as follows: "Every material allegation of the bill not controverted by an answer, and every material allegation of new matter in the answer constituting a claim for affirmative relief, not controverted by a reply, shall for the purposes of the suit be taken as true and no proof thereof shall be required."

In *Vanbibber* v. *Beirne*, 6 W. Va. 168, it was held that the section 35 above quoted applies only when the answer sets up new matter, for which a cross-bill might be filed, and does not change the general practice as to pleading in equity in other cases. In Virginia, where no such statute exists, it has been held, that where an injunction was granted to the sale of a slave, claiming that plaintiff was entitled to the slave, as against creditors, the defendants answered but filed no cross-bill, and in their answer insisted that the creditors were entitled to be paid out of the proceeds of the sale of the slave. Judge Baldwin upon appeal said: "And the court having thus assumed jurisdiction of the case, it was proper that it should go on to dispose of the whole subject according to the rights of the parties, by applying the hires which had accrued from said slave while in the hands of the court, toward the discharge of said executions, and proceeding for a satisfaction of the residue thereof, by a sale of the slave, and a proper application of the proceeds; a relief to which the appellees would unquestionably have been entitled, if they had filed a cross-bill for that purpose; *and which filing of a cross-bill under the circumstances of the case, would have been a mere formality.*" *Taylor* v. *Beale*, 4 Gratt. 93. Why would it under the circumstances of that case have been a mere formality to have filed a cross-bill? Because the issue was just as clear and the rights of the parties as well protected without it as with it. No one was taken by surprise; the proofs were taken on bill and answer, in the same way, and to the same extent, as if a cross-bill had been filed.

In *Mettert* v. *Hagan*, 18 Gratt. 231, a bill was filed to recover a certain interest in an estate; an answer was filed resisting the recovery, on the ground that the party was incapable from drink of making the deed, that it was procured

from him by the fraud of the plaintiff; and asking that the deed might be declared null and void for the fraud in its procurement and the incapacity of the grantor to transact business, &c. Very much like the prayer for affirmative relief in the case before us. Judge Joynes in delivering the opinion of the court said: "Though according to the strict rules of pleading the said deed could not be annulled and set aside without a bill or cross-bill filed for that purpose by said Mettert's administrator, the answer of the said Mettert's administrator may for that purpose be treated as a cross-bill, so as to enable the court to do complete justice in the case, and if it shall be ascertained that said deed was obtained by fraud and was not subsequently affirmed, the same should be set aside and annulled, upon the payment to said Hagan of the value of the consideration paid or delivered therefor by him, with interest thereon, for the re-payment whereof the said deed should be held as a security." No process was directed to be issued on the answer so ordered to be treated as a cross-bill. The meaning of the court plainly is, that it might stand in that case under the circumstances the same as a cross-bill, that the same relief could be given upon the bill and answer in that case, as if a formal cross-bill had been filed; that according to the strict rules of pleading a cross-bill would have been proper, yet it was not under the circumstances of that case, necessary.

We do not think a cross-bill was necessary under the circumstances of this case. If the statute had not been passed there could have been but one reply in writing, and that would have been a general denial of the matters set up in the answer. That denial was accomplished by the general replication, and the proofs were precisely the same as they would have been had there been a reply in writing. The rules of chancery pleading are not so inflexible, as to require us in a case like this, where a fair hearing has been had upon full proofs on both sides, to take the averments of the answer to be uncontroverted and therefore true, when the record convinces us that justice has been done in the case and no one is injured by the failure to file a "reply in writing," and thus sacrifice the justice of the cause to a technicality. Section 4 of chapter 134 of the Code declares: "No

decree shall be reversed for want of a replication to the answer, where the defendant has taken depositions, as if there had been a replication." This does not apply to a case where but for chapter 125, sections 35 and 36, a cross-bill would have been necessary, because if a cross-bill had been necessary, if filed and not answered, it would be taken for confessed. Now when the answer takes the place of a cross-bill, the "reply in writing" is just as necessary as an answer to a cross-bill. This is my own opinion but it is not necessary to decide the question in this cause. But this section 4 further provides : "Nor shall a decree be reversed at the instance of a party who has taken depositions, for an informality in the proceedings, when it appears that there was a full and fair hearing upon the merits, and that substantial justice has been done." This provision does apply in the light of these Virginia decisions with striking force; for under the circumstances of this case, if the statute were not in existence, the omission to file a cross-bill would have been an "informality in the pleadings." If it would have been such then, the failure to apply to the answer the technical rules of a cross-bill by a reply in writing cannot under the circumstances of this case be more than an "informality in the proceedings." Notwithstanding this informality in the proceedings, the defendant, who here seeks to take advantage of it, took numerous depositions to sustain her answer. It certainly appears from the record that there was a full and fair hearing upon the merits, and we think there is no doubt that substantial justice was done.

The language in section 36 "every material allegation of new matter in the answer constituting a claim for affirmative relief not controverted by a reply shall for the purposes of the suit be taken as true and no proof thereof shall be required," refers to such answers as take the place of a cross-bill in a case where it was necessary to file a cross-bill before the statute was enacted. If such construction be not given to the statute its design to facilitate the ends of justice will be defeated.

It is also assigned as error, that the cause was not referred to a commissioner to ascertain all the lands owned by Eve Hedrick, the liens, &c., before the sale was ordered. There

is nothing in this objection. The decree only subjects the three hundred and sixty-nine acres to the payment of the purchase-money. To do this no reference was necessary. The cause was referred to ascertain such matters, as were proper, before any decree could be made to sell any other land to pay any unpaid balance that might remain after the proceeds of the sale of the three hundred and sixty-nine acres had been exhausted. Neither was it necessary to have the accounts of Eve Hedrick's committee settled before the sale was ordered. There was no need of reference to ascertain the title, as it was not disputed. The bill alleges the execution and delivering of the deed, and it is not denied in the answer.

There is no error in the decrees of the circuit court and they are affirmed.

AFFIRMED.