# WHEELING.

## MORELAND *v.* METZ.

Submitted September 18, 1883—Decided April 19, 1884.

24  119
57  495

24  119
f66  232

1. If the court overrule a demurrer to a bill and give the defendant a certain time, in which to answer the bill, it cannot properly make an order of reference to a commissioner, till the time has elapsed, which was given to the defendant in which to answer. (p. 130.)

2. In a suit by a vendor to enforce a vendor's lien other lienors having judgment-liens on the vendee's lands ought not to be made parties to such suit, nor should a notice to all persons holding liens on the real estate of the debtor be published under § 7 ch. 126 of Acts of 1882, said section having no application to a suit brought to enforce a vendor's lien. (p. 130.)

3. If a vendor sells a tract of land with special warranty of title, and at the time of the sale and conveyance the tract of land has been rented out for a year by an agent of the vendor without his

knowledge or express directions, and the vendor believes when the deed is made, that the farm is unoccupied, and the vendee cannot get possession of the farm for nearly a year, the tenant refusing to vacate it till his term was out, this constitutes a breach of the special warranty of title made by the vendor in his deed, and the measure of damages for such breach is the fair rent of the tract of land for the year the vendee was thus kept out of possession, and in the absence of all evidence to the contrary the rent, which the tenant agreed to pay for the use of the farm for the year in his contract with the agent of the vendor, should be regarded by the court as the fair rental value of the farm and the true measure of damages for such a breach of the covenant of special warranty. The rule as to the measure of damages in such case would be the same in a court of equity as in a court of law. (p. 131 and 137.)

Green, Judge, furnishes the following statement of the case :

At August rules, 1882, Joseph Moreland, trustee, The Morgantown Bank and The Second National Bank of Morgantown filed their bill in the circuit court of Tucker county against Minerva J. Metz and Elias Metz her husband. The bill stated that the plaintiff, Joseph Moreland, trustee, on March 26, 1880, sold to Minerva J. Metz three tracts of land containing altogether two hundred and ninety-four acres and constituting one farm known as the Marsh farm lying near St. George in said county; that a conveyance was made of the said tracts of land to Minerva J. Metz; and for the unpaid purchase-money of seven hundred dollars she executed her seven notes all bearing even date with the deed March 6, 1880, payble to Joseph Moreland, trustee of the Morgantown Bank, and each for the sum of one hundred dollars with interest from date, payable one of them each successive year for seven years; and this unpaid purchase-money represented by these seven notes was secured by the reservation on the face of the deed of the vendor's lien; that M. J. Metz and her husband, Elias Metz, took possession of this Marsh farm and now hold the same; but that this deed has never been recorded by the vendee and was not therefore exhibited with the bill; that the seven notes however were exhibited and on their face stated that they were for the unpaid purchase-money of this Marsh farm. The bill then states, that since the sale The Morgantown Bank, which was the real vendor

of said land, the legal title to which was in Joseph Moreland, trustee, had been reorganized as a National Bank under the name of the Second National Bank of Morgantown and all the assets of said Morgantown Bank passed to and now belong to said Second National Bank of Morgantown, among which is said debt of seven hundred dollars and interest. The prayer of the bill was that the court decree the sale of said real estate for the payment of the unpaid purchase-money aforesaid and for general relief.

A general demurrer to the bill was filed by the defendant at the same rules at which the bill was filed. On Sept. 6, 1882, the court overruled this demurrer, and referred the cause to a commissioner to ascertain and report the liens on this "Marsh farm," their amount, to whom due and the order of their priorities; and the commissioner was directed to publish a notice to lien-holders as required by section 7 of chapter 126 of Acts of 1882; and Minerva J. Metz was required to produce and file before said commissioner the deed to her; and the defendants were given leave to answer the bill within thirty days.

Numerous depositions were taken, which proved that the defendants, Metz and wife, on July 18, 1876, conveyed to John R. Robinson, trustee, to secure debts to Shriver and Santee, creditors of Elias Metz, debts which on March 20, 1877, amounted with interest, after allowing all credits, to two thousand six hundred and seventy-four dollars and seventy-two cents, a tract of land in Monongalia county containing two hundred and forty-four acres, owned by said Elias Metz, which at the time had on it a prior trust, which with interest amounted at last named date to five hundred dollars. These debts so secured not having been paid, the trustee in pursuance of the provisions of this deed of trust sold land at public sale on March 20, 1877, when it was purchased by Shriver and Santee for three thousand six hundred dollars, and a deed was at once made to them by the trustee. The purchase-money after paying all costs paid off these liens on the land leaving a balance in the hands of the trustee of two hundred and sixty-eight dollars and fifty-three cents coming to Metz. Regarding this tract of land as sold at a grossly inadequate price and that the sale was not a fair one,

Metz brought a suit to set aside the sale claiming that the tract of land was worth seven or eight thousand dollars. The purchasers regarded the sale as a fair one and resisted the attempt to set it aside. As a compromise they offered to sell it back to Metz for three thousand five hundred dollars, one hundred dollars less than they paid for it. The plaintiff, the Morgantown Bank, owned a tract of land in Tucker county known as the Marsh farm containing two hundred and forty-four acres, the same named in the bill, which they had purchased of a commissioner of the court in order to secure a debt due them; the deed of which had been made to the plaintiff, Moreland, as trustee for the Morgantown Bank. This sale had been confirmed by the court on May 7, 1878, and the deed made as directed by the court. Before the bank purchased this farm it had been sold by Marsh to Jenkins, who bought with it the personal property thereon. This personal property was valued at six hundred and sixty dollars and fifty cents; and the land was valued at two thousand six hundred and fifty dollars. But the realty and personalty being sold together, the consideration mentioned in the deed from Wm. Marsh to Jenkins was the entire price paid by Jenkins, which was three thousand two hundred and ninety-seven dollars and sixty-eight cents. The bank held this Marsh farm from the date of their purchase in May, 1878, till they sold it to the defendant, Minerva J. Metz, and received for it a rent much less than the interest on the purchase-money. For the year ending March 1, 1880, it rented for sixty dollars; and for the year ending March 1, 1881, for fifty dollars.

The bank was under these circumstances desirous of selling this Marsh farm and gave no direction for it to be rented from March 1, 1880, to March 1, 1881, hoping to sell it, but their agent in Tucker county not knowing their wishes rented it for the year ending March 1, 1881, and did not promptly inform the bank that he had done so; so that when they sold this Marsh farm to Minerva J. Metz, the president and directors of the bank did not know that it had been rented for the year ending March 1, 1881, but supposed that the possession of it was vacant, and that they could give possession of it to a purchaser at any time.

Shriver and Santee being anxious to get out of their controversy and suit with Metz, if they could do so without suffering serious loss, and Metz being also anxious to settle the controversy and suit, if he could arrange so as to get some other farm in place of the Monongalia farm, the parties came to this agreement, that Shriver and Santee, who held the title to the two hundred and forty-four acre tract in Monongalia, should convey it to Emrod Tennant as trustee for the bank it paying to them three thousand five hundred dollars, one hundred dollars less than they paid for it, and paying to Metz one thousand six hundred and forty-two dollars, making in all five thousand one hundred and forty-two dollars to be paid by the bank for the two hundred and forty-four acres of land in Monongalia including the growing crop of wheat estimated to be worth one hundred and forty-two dollars. This one thousand six hundred and forty-two dollars was not to be paid in money but to be allowed as a credit on what Minerva J. Metz, the wife of Elias Metz, would owe for the purchase of the Marsh farm, which she would buy of the bank at two thousand three hundred and forty-two dollars, which was about three hundred dollars less than Jenkins had given for it. Deducting this one thousand six hundred and forty-two dollars which the bank was to pay to Metz in the compromise with Shriver and Santee there would remain a balance of seven hundred dollars to be paid by Minerva J. Metz, as the unpaid purchase-money of the Marsh farm, and this she was to pay in seven equal annual payments of one hundred dollars each, all bearing interest from date; and this was to be secured by a reservation of the vendor's lien, when the deed should be made by the bank, by its trustee, to Minerva J. Metz. By this agreement Metz who was in possession of this two hundred and forty-four acres of land was to give possession of it by the 1st day of April, 1880. Nothing was said about the time when Minerva J. Metz was to get possession of the Marsh farm. At the time, when this arrangement was made, Metz and his wife did not want to move to this Marsh farm that year but preferred renting a place in Monongalia county.

This arrangement was carried out; Joseph Moreland, trustee of the bank, and the old corporation, the Morgantown

Bank, and the new corporation, the Second National Bank of Morgantown, conveying on March 26, 1880, this Marsh farm to Minerva J. Metz "with covenant of special warranty;" and on the same day Shriver and wife and Santee and wife conveyed the Monongalia farm of two hundred and forty-four acres "with covenants of special warranty" to Emrod Tennant, trustee of the Second National Bank of Morgantown. The bank sold the Monongalia farm of two hundred and forty-four acres afterwards for between five thousand and five thousand five hundred dollars which probably put the bank about even in its purchase and sale of the Marsh farm and the farm in Monongalia county.

After Metz and wife had surrendered the Monongalia farm to the bank, about April 1, 1880, he went to Tucker county to see the Marsh farm and found it was rented till March 1, 1881; and when he came back and reported this fact to the cashier of the bank, who knew nothing of it prior to that time, the cashier wrote to an agent of the bank, who had been paying some attention to this farm, and who had rented it out till March 1, 1881, without directions from the bank, supposing they wanted it rented, "that he, the cashier, was sorry he had rented it, and asking him to see the tenant at once and ascertain the best terms, on which he could be bought off, so as to get possession at once if required. The purchaser still does not want to move to it but may be compelled to do so. He does not want to leave his old neighborhood." This agent of the bank sees the tenant who was unwilling to give up possession and did not say what he would take to surrender the place but said: "If the bank must have the place he would give it up, but he thought it would cost the bank more than they would like to pay, as he had planted out his garden stuff." He said "it was important to settle the matter at once as most of the tillable land had been in corn last year and should now be sown in oats and that should be done speedily."

It was about April 21, 1880, that this proposition was made to the tenant. The cashier at or on April 23, 1880, wrote to Metz, and told him he had just heard from Tucker county, and stated to him that they could get possession of the farm for him, if he desired it, and stating that when last

he saw him he had not made up his mind that he wanted possession of the farm that year. The cashier in this letter told him he must "know at once and that without delay if he wanted possession;" and he said that he had been told that one Richardson would let him stay on his farm in Monongalia that year. Metz replied promptly to this letter, that he wanted possession of the farm and farm-house by May 5, 1880. On April 28 the cashier of the bank wrote to his agent in Tucker "to buy the tenant off altogether and let him, Metz, rent one of the houses on the place to the tenant. He said the bank would rather pay something to get rid of the whole matter, though he said the bank had not agreed to give possession that spring. Nothing being said about possession as the Metzes did not expect to need possession that spring; but the bank thought it best to get possession for him as he wanted it now." At the same time the cashier wrote to Metz, told him what he had done, and advised him not to move to Tucker, till he heard from him again, saying he would write as soon as he got a reply from Tucker. But if he should go before he heard from him, not to take his family, till he or one of his boys had gone there first.

The tenant of this farm refused to give up possession till his term was out, March 1, 1881, at any price. But Elias Metz and his family moved there without waiting to hear from the cashier, and when they got there in May, 1880, the tenant let him and his family occupy a very indifferent cabin upon the Marsh farm, which was vacant. The next winter was a very cold winter; and Metz and his family lived very uncomfortably in this indifferent cabin; and their stock and cattle suffered for want of food and shelter. Two of their horses died that winter, which were worth according to Metz's statement two hundred dollars. Several witnesses besides Metz and his wife stated that in their judgment the damages sustained by Minerva J. Metz was one thousand dollars, estimating the inconvenience and suffering by her and her family and the losses they sustained in the manner above specified by not getting possession of the farm in the spring of 1880 instead of 1881, and having to occupy in the manner they did this cabin in the winter of 1880–81.

There is an attempt to show, that Metz for his wife was

induced to make this purchase of the bank and the arrangements connected therewith (with Shriver and Santee) by the fraudulent representations by the cashier of the bank as to the value of this farm and the character of the improvements upon it and the price, at which it had theretofore sold, and also by his misrepresentation of the ability of the bank to give possession of this Marsh farm in the spring of 1880. The testimony on this question is to some extent conflicting; and it will be stated in the opinion with the conclusions I have reached as to that point.

The answers of Elias Metz and his wife, which were not filed till all the depositions had been taken and the cause was about being submitted to the court for its decree on the merits, on this point state, that "the cashier of the bank represented to Metz, that the Marsh farm had been sold by Marsh to Jenkins for three thousand three hundred dollars; that it had on it a good house with eight rooms and the best barn in Tucker county; that it was not encumbered by any act of the bank; and that the tenant was making from six hundred dollars to eight hundred dollars a year from the farm. All of which representations were false and untrue. For the farm was sold by Marsh to Jenkins for two thousand six hundred dollars and had no such house upon it as was represented, and but a poor barn, and was then occupied by a tenant, whose term began March 1, 1880, and ended March 1, 1881; that by reason of these false and fraudulent representations and the pressure of their private business they were induced to make this trade, believing said representations to be true, without ever seeing this Marsh farm."

In the answer of Minerva J. Metz she states in addition, that they made this trade to relieve Metz of his debts and to secure for the family a comfortable home. They set out in detail, as above stated, the discomfort, inconvenience and losses, which they sustained in consequence of not getting possession of the farm till the spring of 1881, which they estimate at one thousand dollars and she in her answer itemizes the several losses which go to make up this one thousand dollars. Among the items she puts the loss of the use of the farm from March 1, 1880, to March

1, 1881, at five hundred dollars, and the loss of stock and damages to the same, loss of household goods and damages to the same, manure moved from the farm, timber cut and removed and destroyed, her personal sufferings and those of her family and the inconvenience by reason of being compelled to occupy a house not fit to be inhabited, five hundred dollars, making in all one thousand dollars damages, which she believes she has sustained; and she asks that this may be set-off against her seven notes of one hundred dollars each, and that the balance which will be due her may be decreed to be paid to her.

There was no proof that manure had been removed from the farm by the tenant or timber cut and removed from the farm or destroyed by him. These, so far as the evidence shows, were unfounded allegations; nor is there any proof of the character of the dwelling-house and barn.

The commissioner reported that the seven hundred dollars and interest, as above stated, was a vendor's lien on the Marsh farm and the only lien upon it; and he reports that he retained the report in his office for ten days after it was made, and no exceptions were taken to it. It is dated December 18, 1882. On December 21, 1882, the following decree was rendered by the court in this cause:

"This cause came on this day to be further heard upon the papers read on former hearing, former orders and decrees herein, the separate answers of defendants, Minerva J. Metz and Elias Metz, general replication thereto, the deed of Joseph Moreland, trustee,. &c., conveying to said Minerva J. Metz the three tracts of land in the bill mentioned, filed herein by said M. J. Metz, and the tax receipt for 1881, depositions of witnesses, and upon the report of John J. Adams, one of the commissioners in chancery of this court, to which there are no exceptions, and was argued by counsel. And the court now proceeding to ascertain the liens upon the said lands in the said bill and proceedings mentioned, doth adjudge, order and decree that the plaintiffs have a lien on said land for the purchase-money, amounting to the sum of seven hundred dollars, as of the 26th day of March, 1880, of which there is now due to the said Joseph Moreland, trustee, for the Second National Bank of Morgantown, successor to the Morgantown

Bank, the sum of two hundred and thirty-two dollars and seventy-two cents, with interest thereon from the 18th day of December, 1882, subject to a credit of eighty-two dollars and three cents as of the 1st day of March, 1881, being the rent of said land from March, 1880, to March, 1881, and the taxes for the year of 1880, which the court is of opinion should be abated from said purchase-money, leaving the sum of one hundred and forty-two dollars and forty-six cents now due, and that there will be due to said Moreland, trustee as aforesaid, one hundred dollars each on the 26th day of March, 1883, 1884, 1885, 1886 and 1887, respectively, with interest on each of said sums from the said 26th day of March, 1880. It is further adjudged, ordered and decreed that unless the said Minerva J. Metz, or some one for her, shall within thirty days from this date, pay to the said Joseph Moreland, trustee as aforesaid, the said sum of one hundred and forty-two dollars and forty-six cents, with interest thereon from the 18th day of December, 1882, together with the costs of this suit, which are adjudged to the said plaintiffs, that then it shall be the duty of John Barton Payne and John M. Crane, either of whom may act, who are hereby appointed special commissioners for the purpose, to make public sale of said three tracts of land, containing respectively, fifty-four and one half, one hundred and forty-three and ninety-six and one half acres, at the front door of the court-house of said county, on some court day therefor, for so much cash as will pay the costs of suit and proper charges for sale, and of the residue a sufficient part thereof on a credit of six and twelve months to pay the said sum of one hundred and forty-two dollars and forty-six cents, with interest, as well as such further sum as may be due on the day of sale, and the residue in equal payments due respectively on the 26th day of March, 1884, 1885, 1886 and 1887, the purchaser executing notes with good security for all of said deferred payments, bearing interest. But before making a sale the said commissioners shall advertise the time, terms and place of sale by notice published once a week in some weekly newspaper published in this county, giving a general description of the property, and by posting the same for four weeks at the front door of the court-house thereof, and before receiving any money under

said decree, said commissioners shall execute before the clerk of this court bond in the penalty of one hundred dollars, conditioned according to law, with surety to be approved by the clerk of this court."

From this decree the defendants, Minerva J. Metz and her husband, Elias Metz, have obtained an appeal and *supersedeas.*

*A. F. Haymond, A. B. Parsons* and *W. B. Maxwell* for appellants.

*John Barton Payne* for appellees.

GREEN, JUDGE:

The demurrer to the bill in this cause is based on two grounds. One ground is that one of the plaintiffs, the Morgantown Bank, is a defunct corporation and cannot therefore sue; and that the Second National Bank of Morgantown, another co-plaintiff, being a National bank cannot succeed to those rights of the Morgantown Bank, which savor of or pertain to the matter; and the rights set up in the plaintiffs' bill, which are averred to have passed from the Morgantown Bank to the Second National Bank of Morgantown, are not of the character of rights which can be succeeded to under the law. There is nothing in this demurrer. Chapter 53, sec. 59 of the Code of West Virginia, p. 403, expressly provides, that suits may be brought after the dissolution of a corporation or after its expiration, so far as shall be necessary for prosecuting and protecting its rights, just as such suit might be brought before the dissolution or expiration of the corporation. The other ground of demurrer is equally without foundation. What the bill alleged had passed from the Morgantown Bank to the Second National Bank of Morgantown was this debt due from the defendant, Minerva J. Metz, secured by the vendor's lien on the Marsh farm. Upon the re-organization of the Morgantown Bank whereby it became a National bank under the name of the Second National Bank of Morgantown, under sec. 5154, title 62 of Revised Statutes of the United States, 2d Ed., 1878,

the National Bank of Morgantown unquestionably became entitled to this debt. When a State bank is re-organized and becomes a National bank, its identity is not thereby destroyed. It remains substantially the same institution under another name. The transition does not disturb the relation of either the stockholders or officers of the corporation; nor does it enlarge or diminish the assets of the institution. These all remain the same under the National as they were under the State organization. The bank neither loses any of its assets nor escapes any of its liabilities by the change. The change is a transition and not a new creation. *Coffee* v. *The National Bank of the State of Missouri*, 46 Mo. R. (5 Post) 140; also *Grocers National Bank* v. *Clark*, 48 Barb. 26, and *Thorpe* v. *Wegefarth*, 56 Pa. St. 82.

The circuit court therefore properly overruled the demurrer to the bill of the plaintiffs by its decree of September 6, 1882. But it erred in this decree in referring the cause to a commissioner to ascertain the liens on this Marsh farm and their priorities after publication as provided by sec. 7 of ch. 126 of Acts of 1882, p. 369. This section applies to a creditors' bill brought by one or more judgment-creditors to enforce their liens against the debtor's real estate. It has no application to a suit brought by a vendor against his vendee to enforce his vendor's lien, which is still to be conducted as it always was, it being unnecessary to make other lien-creditors parties to the suit either formally or informally, and of course unnecessary to have them convened before a commissioner, and their liens and priorities ascertained. Such proceeding is not only unnecessary but improper. *Cunningham* v. *Hedrick et al.*, 23 W. Va. 579. If such an order of reference or any other order of reference had been proper in this cause, it ought not to have been made in this decree of September 6, 1882, because by this decree the defendants demurrer to the plaintiffs' bill had been overruled, and leave was given to the defendants to file their answer in thirty days; and till the expiration of this thirty days no decree of reference could properly be made. (*Neely* v. *Jones*, 16 W. Va. 626, point 7 of syl., also p. 649, and *Peck* v. *Chambers*, 8 W. Va. 210, 215.) But the appellants cannot complain in this Court

of this order of reference being improperly made. The commissioner reported that there were no liens on this Marsh farm except the plaintiffs' vendor's lien. The amount of it was undisputed, being admitted in the answer. So though this report was formally confirmed, it had no effect whatever in the cause. There was an unnecessary cost of a few dollars incurred by this reference to the commissioner but no delay, and from it no prejudice or benefit arose to either party. It must therefore be simply regarded as a useless proceeding.

In the decree of December 21, 1882, a credit was given by the court on this acknowledged vendor's lien of eighty-two dollars and three cents, the amount of taxes for the year 1880 which had been paid by the purchaser or for her on this Marsh farm and the rent of the farm from March, 1880, to March, 1881, when the vendee obtained possession. The amount of taxes for 1880 so paid were exactly ascertained by the tax receipts referred to in this decree to be thirty-two dollars and three cents; and fifty dollars was therefore the credit given for the rent. There can be no question that the credit of thirty-two dollars and three cents for the taxes for the year 1880 was properly chargeable to the trustee of the bank and not to Minerva J. Metz, as the sale of this farm and deed to her was not made till March 26, 1880; and it is equally clear, that the defendant had no claim to be credited with the taxes on this farm for 1881 paid by her or for her, as it is obvious, that she was properly chargeable with these taxes for 1881, and the bank was under no obligation to pay them.

The only question of controversy is: Did the circuit court properly confirm the balance of the credit to the rent of the land for the year that Minerva J. Metz could not get possession of it after the deed was made, or should the court have gone further and allowed her the whole or any part of the damages beyond this rent, which she claimed to have suffered from her being unable to get possession? As in the judgment of some of the courts in the United States the decision of this question as to the true measure of damages in such a case would depend upon whether the vendor had acted fraudulently in the sale and deceived and misled the

vendor, I propose before taking up and considering the proper measure of damages in this case to consider, whether it be true, as charged by the defendant, that the bank induced the appellants, the defendants below, to purchase this farm by false and fraudulent misrepresentations of facts which would naturally affect that estimation of its value and also by the false and fraudulent representation that they could get immediate possession as soon as the sale was completed, and that the purchase was made because of these false and fraudulent representations by the bank, they being relied upon by the appellants as true.

In the first place, there can be no question but that this contract for the sale of the Marsh farm was made by Emrod Tennant, a director of the bank, with Elias Metz, the husband of Minerva J. Metz, to whom the deed was made at the request of her husband. It is true that Elias Metz represents that the contract was made by him and the cashier of the bank; but this is denied both by the cashier of the bank and by Emrod Tennant. And that they state the truth in this respect is clearly shown by the statement of the transaction on the record-books of the directory made at the time, of which the following is a copy:

"SECOND NATIONAL BANK OF MORGANTOWN,  }
          "MARCH 26th, 1880.                }

"At a special meeting of the directors of the bank—present, George W. John, W. B. Long, Emrod Tennant, Joseph Moreland and William C. McGrew—Mr. Emrod Tennant reported that Elias Metz and Solomon H. Shriver were in town to arrange their affairs.

"He further reported that he had arranged with Elias Metz for and in behalf of his wife, Minerva J. Metz, to sell her the Marsh farm of two hundred and ninety-five acres (belonging to the bank), lying on Cheat river, in Tucker county, West Virginia, for the sum of two thousand three hundred and forty-two dollars, provided he could arrange his affairs with Solomon H. Shriver regarding the farm now in his possession and occupied by him, Metz, but owned by said Shriver.

"And it being further reported to this board that said

Shriver and Metz had arranged their difficulty, by which agreement said Shriver agrees with said Metz to sell and convey to the said Second National Bank of Morgantown the farm of two hundred and forty-four acres now occupied by said Metz, lying in Battelle district, in Monongalia county, West Virginia, upon the payment by said bank of the sum of *three thousand five hundred dollars* to him, the said Shriver and to allow the additional sum of one thousand six hundred and forty-two dollars in *part* payment for the said Marsh farm, and the residue of the purchase money for said Marsh farm, seven hundred dollars, to be paid in seven annual payments of one hundred dollars each, with interest from date, to secure the payments of which a vendor's lien is to be retained in the deed, and with the further understanding that said Metz was to remove from and vacate the said farm of two hundred and forty-four acres which he now occupies by the 1st ot April next, and have all growing crops of grain, &c., in consideration whereof, he, said Metz, was allowed one hundred and forty-two dollars in the above described contract,—on motion of W. C. McGrew, the propositions as above set forth be and they are hereby accepted, and that the cashier of the bank be and he is hereby directed to pay to said Solomon H. Shriver the said sum of three thousand five hundred dollars upon his delivering to this bank a deed for said land.

"And on motion, it was further ordered that Joseph Moreland prepare the necessary deed to convey the said Marsh farm to said Minerva J. Metz upon the terms above named, and therein provide for the lien as set forth above, and that the president and cashier of this bank join said Joseph Moreland, trustee for this bank, in the conveyance of this said land.

"And be it further resolved that Mr. Emrod Tennant be and he is hereby requested to take charge of the Metz (Shriver) farm and manage it to the interest of this bank.

"GEO. W. JOHN, *President.*
"J. H. HOFFMAN, *Cashier.*

Tennant states, that as agent of the bank, he made this contract with Elias Metz as agent of his wife; and he states

what took place, when this contract was made or before it was entered into between him and Metz, both acting as agents. He says: "When Metz and I were talking about said exchange of lands, which Metz was urging on me, I told said Metz I had never seen the Marsh farm, and he had better go and see it before we traded. Metz said he would not go to see it; that he reckoned it would be worth seven hundred dollars any how, and he would rather the bank would have his Monongalia farm than Sol. Shriver. * * * * Metz wanted to retain the wheat-crop growing on the Monongalia farm, but agreed to give it up to the bank." His report to the bank shows that the bank agreed to allow him one hundred and forty-two dollars for the wheat. Elias Metz in his deposition says: "The testimony of Emrod Tennant in regard to me telling him if the place was worth seven hundred dollars I would rather give my money to the Morgantown Bank than to Mr. S. H. Shriver is false. I did tell him it the place was was worth three thousand three hundred dollars, as the cashier represented, I would not lose much by the trade. The said trade was never made until the board of directors of said bank was in session, and was not made with Mr. Tennant at all." This is all he states about what took place between him and Emrod Tennant. It seems to me obvious, that there is much more probability, that the statement of Emrod Tennant is true than this version of the affair by Elias Metz. It strikes me that there is a good deal of prevarication in his statement. Of course, as he says, said trade was never made until the board of directors of said bank was in session. Of course this is literally true, for the trade was not completed and binding till the board of directors confirmed the contract; and some terms of the contract were then, I presume from the entry on the bank record-book, added that day. But as the report of Tennant acted on by the bank on that day on its face shows, that the price of the Marsh farm had been definitely agreed upon as two thousand three hundred and forty-two dollars by Tennant on the part of the bank and Elias Metz, it looks much like a prevarication on the part of Elias Metz, when he says: "The trade was not made with Mr. Tennant at all." The material question in the case, whether Elias Metz agreed to pay two thousand

three hundred and forty-two dollars, for the farm because of fraudulent misrepresentations made of its value by the agent of the bank, with whom he contracted so far as to agree upon this as the price of this farm, of course depends on what representations have been made by this agent. Although Elias Metz represents the cashier of the bank as the agent of the bank in this matter, it is obvious, that this is not the truth, and even Elias Metz does not pretend that the statement of Tennant, that he told him he had never seen the farm, and that he, Tennant, told Metz he had better go and see it before he traded, is untrue. Nor does he pretend, that, when this price of two thousand three hundred and forty-two dollars was agreed between them as the price of the Marsh farm, any statements whatever were made about its value by Tennant, who professed to have no knowledge of it. Nor does he pretend that there was any stipulation, when possession was to be delivered, or that he told· Tennant, that he wanted possession that spring. And while in the formal terms of the agreement, as it appears on the record-book of the directors of the bank, it appears, that express stipulation was made, that the Monongalia farm was to be put in possession of the bank by April 1, 1880, nothing was said about when Metz was to get possession of the Marsh farm. It is obvious from the testimony that Metz was indifferent about when he should get possession and remained thus indifferent for more than a month, he not then desiring or expecting to move to the Marsh farm during the year 1880.

Metz says : " The cashier represented to me, that the said Marsh farm was sold to one Jenkins for three thousand three hundred dollars, and that it was worth that money, that the dwelling-house and barn were the best in Tucker county, all of which I found to be untrue. He represented to me the farm was free from all incumbrance and I could move on it at any time. Upon these representations I moved my family and property to said farm and found it occupied by the tenant of the Morgantown Bank." I have no doubt, that exaggerated statements of the value of this farm were made by the cashier of the bank; but they had no influence on the price Metz agreed to pay for it, for he had agreed to the

price before these statements were made. Nor is it true that he moved his family to the farm under the belief that he could then get full possession of it, for it is distinctly proven that he had been there and found it occupied by a tenant of the bank for another year. This was nearly a month before he moved his family there and at a time when he did not wish to do so during the year 1880. I have no doubt he was told by the cashier that he could get possession of the farm at any time, but I do not believe that this was told him till after the completion of this contract and the making of the deed to his wife. Prior to that he had made no inquiry on the subject, because he did not expect to occupy the farm during the year 1880. And when the cashier made this statement, he believed that the farm was vacant, and that Metz could take possession of it at any time not knowing it had been rented for another year. The cashier states that he had nothing to do in the preliminary matters of the trade, it having been made on the part of the bank by Tennant, one of the directors. Later, when it does not appear but most probably about the time the deed was made, the cashier admits that he told Metz that Marsh had sold the farm to Jenkins for three thousand two hundred dollars or three thousand three hundred dollars, and he says he had so heard from the parties; but he referred Metz to Marsh, who then lived in Morgantown in Monongalia county, where Metz could see him any day. He states that there was no understanding before the contract was made or when completed as to the time when Metz was to get possession. He states that Metz did not make up his mind definitely to move to the farm till more than a month after the deed was made to his wife, and the letters written at the time show that this is true, and also that the cashier, as he states, did not know that the farm had been rented out for a year till informed of it by Metz, who had been there not to take possession of it but merely to look at it. The statement of the price paid by Jenkins to Marsh for this farm (three thousand two hundred dollars) was a very natural mistake for the cashier of the bank to make, as it was the price stated on the face of the deed; but it seems that this included some six hundred and fifty dollars of personal property so that the real price

was only two thousand six hundred and fifty dollars. It is believed however for the reasons we have stated to have had no influence on Metz in agreeing to pay two thousand three hundred and forty-two dollars for the land. There is no evidence tending to show, that it was not worth the full price he paid for it. One witness proves, that after the deed was made to Minerva J. Metz, the cashier of the bank sent word to Elias Metz, that he could take possession whenever he pleased. That is doubtless true; for the cashier for sometime after the making of the deed so thought, as he proves, and as is shown by letters written at the time.

My conclusion from the evidence is, that there were no fraudulent misrepresentations made by the bank or its agents to induce Metz or his wife to purchase or trade for this Marsh farm, and that when this trade was made, and the deed was delivered to her, neither she nor her husband expected to move to the farm during the year 1880, and that the getting the prompt possession of this farm constituted no part of the inducement to purchase and that there was no fraud or bad faith shown by the bank or its agents in any part of this transaction, though there were some mistakes made by the cashier and especially with reference to the question as to the occupancy of the farm at the time of the sale. But no mistake ever made by him influenced Metz in the purchase. The question of controversy in this case must be decided on the rights of the parties under the covenant of special warranty contained in the deed to Minerva J. Metz, and the fact, that she could not get possession of the farm which she had bought for a year or was influenced by any misconduct or fraud on the part of the vendor, the bank.

Stripped of the extraneous circumstances there is, I think, no difficulty in determining the true measure of damages resulting from the breach of a covenant of general or special warranty of title. The special warranty of title in this case was broken by the renting of this land for a year and the failure to place the vendee in possession, though nothing was said about the possession being delivered in the deed or in the contract on which it was based. If a covenant of warranty is broken in Virginia or West Virginia, the measure of damages, when the land is entirely lost to the vendee,

is the purchase money with interest from the date of the actual eviction, the costs incurred in defending the title and such damages as the vendee may have paid or may be shown to be clearly liable to pay the person who evicted him. But if the actual value of the land at the time of the sale be proven to be greater than the purchase-money with interest, &c., perhaps this actual value might be recovered in lieu of the usual measure of recovery. (*Stout* v. *Jackson*, 2 Rand. 132; *Threlkild's Adm'r* v. *Fitzhugh's Ex'r*, 2 Leigh 451; *Jackson* v. *Turner*, 5 Leigh 119; *Haffey's Heirs* v. *Birchetts*, 11 Leigh 83.

The question of controversy in Virginia was formerly, whether the value of the land at the time of the sale or the value of the land at the time of eviction was the true basis for the measure of damages, when there had been a breach of a covenant of warranty. But it was finally settled in Virginia as in this State, that the basis of the measure of damages should be the value of the land at the time of the sale and not at the time of the eviction, because the covenant of warranty being a substitute for the old *warrantia chartæ* contained generally in feoffments, the measure of recovery should follow that of the old action of *warrantia chartæ*, which was the value of the land at the time of the sale and not at the time of the eviction. Like views have been adopted in almost all the States of the Union and in the Supreme Court of the United States. But in a few States a different view has been taken; and the covenant of warranty and other real covenants similar to it have been regarded very much like other personal covenants, and their courts have declined to adopt as a basis for the measure of damages for the breach of covenants of warranty and other like real covenants the rule laid down in the old action of *warrantia chartæ*, but instead thereof have taken as the basis of the measure of damages for the breach of such covenants very much the measure of damages controlling in ordinary personal covenants, that is, instead of putting the vendee in the position, which he would have been in had he never entered into the contract, restoring to him his purchase-money, interest and costs of defending the title, they adopting the general rule put the vendee in the condition, in which he would have been, if the ven-

dee's covenant had never been broken. This is done by adopting as the basis of damages the value of the land including all improvements upon it at the time of the eviction of the vendee. These views have been taken by the courts of Connecticut, Vermont, Maine and Massachusetts and also by the courts of Louisiana which followed the civil law and of course would not be influenced by the rule in the old common-law action of *warrantia chartæ.*

When the grantor is turned out of possession or kept out of possession by a stranger having a right of possession for an unexpired term in the premises conveyed the covenant of warranty is broken, and the measure of damages in such case is the annual value of the land for the time the vendee is thus kept out of possession together with the costs recovered against the grantor, when he was ejected, and his costs and counsel's fees in defending his possession against such stranger, if it were a case of eviction for a term of years, or some specific time. (*Ricker* v. *Snyder*, 9 Wend. 416.) If a grantor cannot give possession of an estate, which he has conveyed with covenants of general warranty and against incumbrances, because of a life-estate in the land conveyed being in a stranger, this is a breach of the warranty, and the measure of the damages is the value of the estate for the time during which the grantee has been or will be kept out of it. See *Christey* v. *Lucy Ogle's Er'or*, 33 Ill. R. 295.) These cases seem to have reached a conclusion, which is but a sequence of the doctrine laid down, as we have seen, in nearly all the States of the Union, that the measure of damages in case of a breach of a covenant of warranty is the value of the land at the time of the sale. If the eviction is but temporary, as for a number of years or for the life of some third party, the measure of damages should be the value of the land for the term of years or time that the vendee is evicted, that is, the rental value of the land for the time the vendee is deprived of the possession with of course the costs, which he had to pay, or which he incurred if he was evicted by suit.

When however the rule for the measure of damages, which has been adopted in case of permanent eviction, is different from the general rule prevailing in Virginia and nearly all

the other States, as for instance in Massachusetts, they have stated also a different rule, when the eviction is for years. The rule stated in *Earle* v. *Kingsbury*, 3 Cush. 206, is, that the vendee should recover a just compensation for the real injury resulting to him by such eviction for a term of years. It is admitted that this is a very vague and uncertain rule and in its application it is admitted, that one of the modes, in which this just compensation might be ascertained, would be by giving the annual value; and it was suggested, that this might be found to be the just rule in the case then before the court. In *Mills* v. *Catlin*, 22 Vt. 107, though the general rule for the measure of damages, when there is a total eviction of the grantee in Vermont, is the same as in Massachusetts, yet where the incumbrance was a life-estate, the measure of damages adopted in that case was the value of the life-estate; but the court seemed to think it quite questionable, whether this was the correct measure of damages. As in Massachusetts this measure of damages in such a case does not seem consistent with their general rule, which puts the measure of damages in breaches of warranty and of other like real covenants on the same basis as ordinary personal covenants. But even in these States, where the eviction is not in fee but for a time only, there is obviously a disposition to adopt the value of the estate for the time, for which the grantee is evicted, as the best because the most certain measure of damages.

In Rhode Island although there is a disposition to adopt the Massachusetts rule for measuring damages in a breach of a covenant of warranty by an eviction in fee, yet in *Porter* v. *Bradley et ux.*, 7 R. I. 538, the rule for the measure of damages, where the eviction was for the unexpired term of a lease, was the fair rental value of the land to the expiration of the lease. And in view of our law granting as the measure of damages, where there is a breach of a warranty by an eviction in fee of the whole land, nothing but the value of the land at the time of the sale and interest from time of eviction and costs and our refusal to allow as the measure of damages the value of the land at the time of the eviction or anything for improvements, which the grantee may have put on the land and lost, or anything for the loss of his bar-

gain, if it were a good one, or anything for any sort of inconvenience, to which he may have been subjected by being evicted from his home, it would seem clear, that, when the eviction is for a year, as in this case, the only damages, which can be allowed the vendee, is the rental value for such year. The rent actually paid for the year to the grantor or to any one else would be *prima facie* this fair rental value for the year; but it might be proven that it was less than the fair rental value; and if this was shown, this fair rental value should be allowed and not the actual rent paid that year. (*Bolling* v. *Lersner*, 26 Gratt. 36.)

In this case the court allowed to the grantee as damages for the breach of the covenant of warranty fifty dollars, which was proven to be the actual rent paid for the land for the year during which the grantee did not have the possession of it, and there was no proof that it was not the fair rental value for that year. The court properly adopted it as such fair rental value and as the true measure of the vendee's charges to be abated from the purchase-money unpaid. There was of course no necessity to make any order of reference to ascertain this damage for it was simply a year's rent of the farm, which could readily be determined by the court without the aid of a commissioner's report.

If the fraud as is alleged by the vendor induced the vendee to purchase the farm with the assurance that she could get possession of it immediately, and if she purchased, because she wanted a home, into which she could move with her family, and the grantor knew when he sold the land to her that he could not give possession of it for a year, and fraudulently concealed this from her, though he knew that this was a very strong reason with her for purchasing this land, then in certain of the States a different measure of damages from this mere rental value of the land for a year would be adopted. But nowhere even under such circumstances, as I have imagined to exist, could she have had any such damages as she claims. To allow such claims for damages in any case would be to violate fundamental principles of law by giving remote and speculative damages, which could not be said properly to have been the result of the misconduct and fraud of the vendor had he been guilty of such conduct. But most of the

damages claimed by the defendant had no connection as cause. and effect with the supposed misconduct and fraud of the vendor.

The decree of the circuit court of December 21, 1882, must be affirmed, except so far as it directs a sale of the Marsh farm on the terms and credits prescribed in that decree, which have become improper by reason of the notes of the defendant Minerva J. Metz, which are liens on the lands, having become due and payable, since the said decree was rendered. And thus it has become necessary and proper to modify this portion of said decree, and for this purpose the cause must be remanded to the circuit court of Tucker county with instructions to enter a decree for the sale of this Marsh farm in such part thereof, as is necessary to pay the lien declared and established upon it by said decree of December 21, 1882, and naming a commissioner or commissioners to make such sale, fixing in the decree such terms and conditions of the sale, as to the said circuit court may seem just and proper, and otherwise to proceed with this cause according to the principles governing courts of equity; and the appellants must pay to the appellees their costs in this Court expended and thirty dollars damages.

AFFIRMED IN PART. REMANDED.